FRANK A. MAGNANIMO
**MAGNANIMO & DEAN, LLP**
21031 Ventura Boulevard
Suite 803
Woodland Hills, CA 91364
Telephone: (818) 305-3450
Facsimile: (818) 305-3451
Email: Frank@MagDeanLaw.com

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JOSELITO GONZALES, Derivatively on Behalf of Nominal Defendant ACELRX PHARMACEUTICALS, INC., | ) ) ) ) ) | CASE NO.: **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| ADRIAN ADAMS, RICHARD AFABLE, M.D., MARK G. EDWARDS, VINCENT J. ANGOTTI, STEPHEN J. HOFFMAN, M.D., PH.D., PAMELA P. PALMER, M.D., PH.D., MARINA BOZILENKO, HOWARD B. ROSEN and MARK WAN, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | **JURY TRIAL DEMANDED** |
| ACELRX PHARMACEUTICALS, INC. | ) ) | |
| Nominal Defendant. | ) ) ) | |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

Plaintiff Joselito Gonzales ("Plaintiff"), on behalf of AcelRx Pharmaceuticals, Inc. ("AcelRx" or the "Company"), derivatively, alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief and investigation of counsel as to all other matters.  That investigation included, among other things, a thorough review and analysis of public documents, court filings, press releases and news articles concerning AcelRx, and the other facts as set forth herein:

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of and for the benefit of AcelRx, against certain of its officers and/or directors named as defendants herein seeking to remedy their breaches of fiduciary duties.  Defendants' actions have caused, and will continue to cause, substantial financial harm and reputational damage to AcelRx.

2.      The Company is a specialty pharmaceutical company, focusing on the development and commercialization of therapies for the treatment of acute pain.  The Company's lead product candidate is DSUVIA, a 30 mcg sufentanil sublingual tablet for the treatment of moderate-tosevere acute pain.

3.      On November 2, 2018, the Company announced that the U.S. Food and Drug Administration ("FDA") had approved DSUVIA for the management of acute pain in adults that is severe enough to require an opioid analgesic in certified medically supervised healthcare settings, such as hospitals, surgical centers, and emergency departments.

4.      Throughout the Relevant Period (March 17, 2020 to the present), Defendants caused the Company to make false and/or misleading statements and/or failed to disclose that: (i) the Company had deficient disclosure controls and procedures with respect to its marketing of DSUVIA; (ii) as a result, the Company had been making false or misleading claims and representations about the risks and

efficacy of DSUVIA in certain advertisements and displays; (iii) the foregoing conduct subjected the Company to increased regulatory scrutiny and enforcement; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.      On February 16, 2021, the Company disclosed that, on February 11, 2021, it received a warning letter from the FDA concerning promotional claims for DSUVIA. Specifically, having "reviewed an 'SDS Banner Ad' (banner) (PM-US-DSV-0018) and a tabletop display (PMUS- DSV-0049) (display)," the FDA concluded that "[t]he promotional communications, the banner and display, make false or misleading claims and representations about the risks and efficacy of DSUVIA," and "[t]hus . . . misbrand Dsuvia within the meaning of the Federal Food, Drug and Cosmetic Act (FD&C Act) and make its distribution violative." The warning letter "request[ed] that AcelRx cease any violations of the FD&C Act" and "submit a written response to th[e] letter within 15 days from the date of receipt."

6.      On this news, the Company's stock price dropped $0.21 per share, or 8.37%, to close at $2.30 per share on February 16, 2021.

## JURISDICTION AND VENUE

7.      Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violation Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

8.      The Court has jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in California or is an individual who has sufficient minimum contacts with California so as to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the Defendants either resides in or maintains executive offices in this District, including Nominal Defendant AcelRx, a substantial portion of the transactions and wrongs complained of herein – including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting in violations of fiduciary duties owed to AcelRx – occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

10. In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## PARTIES

**Plaintiff**

11. ***Plaintiff Gonzales*** is a current AcelRx shareholder during the relevant period. Plaintiff purchased 5,000 shares of AcelRx stock on October 11, 2018, and 6,000 shares of AcelRx stock on October 16, 2018. Plaintiff will continue to hold AcelRx shares throughout the pendency of this action. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

12. Nominal Defendant AcelRx is a Delaware corporation with principal executive offices located at 25821 Industrial Boulevard, Suite 400, Hayward, California 94545. The Company's common stock trades in an efficient market on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "ACRX."

**Director Defendants**

13.     **_Defendant Adrian Adams_** ("Adams") has served as the Company's Chairman of the Board of Directors (the "Board") since February 2013.  Defendant Adams served on the Audit Committee prior to Defendant Howard B. Rosen's appointment to the committee effective on June 16, 2020.

14.     **_Defendant Richard Afable, M.D._** ("Afable") has served as a Company director since December 2013.

15.     **_Defendant Mark G. Edwards_** ("Edwards") has served as a Company director since September 2011.  Defendant Edwards is a member of the Audit Committee.

16.     **_Defendant Vincent J. Angotti_** ("Angotti") has served as a Company director and Chief Executive Officer ("CEO") since March 2017.

17.     **_Defendant Stephen J. Hoffman, M.D., Ph.D._** ("Hoffman") has served as a Company director since February 2010.  Defendant Hoffman is a member of the Audit Committee.

18.     **_Defendant Pamela P. Palmer, M.D., Ph.D._** ("Palmer") has served as a Company director and Chief Medical Officer since she co-founded the Company in July 2005.

19.     **_Defendant Marina Bozilenko_** ("Bozilenko") has served as a Company director since March 2021.

20.     **_Defendant Howard B. Rosen_** ("Rosen") served as the Company's CEO from April 1, 2016 until March 5, 2017, as the Company's interim CEO from April 1, 2015 until March 31, 2016, and has served as a Company director since 2008.  Defendant Rosen is a member of the Audit Committee.

21.     **_Defendant Mark Wan ("Wan")_** has served as our director since August 2006.

22.     Defendants Adams, Afable, Edwards, Angotti, Hoffman, Palmer, Bozilenko, Rosen and Wan are collectively referred to herein as "Director Defendants."

**Officer Defendant**

23.     ***Defendant Raffi Asadorian*** ("Asadorian") served as the Company's Chief Financial Officer at all relevant times.

24.     Defendants Asadorian is herein referred to as the "Officer Defendant."

25.     The Director Defendants and Officer Defendant are collectively referred to herein as the "Defendants."

**Audit Committee Charter**

26.     Pursuant to the Company's Audit Committee Charter, the purpose of the Audit Committee is to assist the Board with oversight of the Company's accounting and financial reporting processes and the audit of the Company's financial statements.

27.     The Audit Committee Charter states in relevant part:

The primary purpose of the Audit Committee (the "Committee") of AcelRx Pharmaceuticals, Inc. (the "Company") shall be to act on behalf of the Company's Board of Directors (the "Board") in fulfilling the Board's oversight responsibilities with respect to the Company's corporate accounting and financial reporting processes, systems of internal control over financial reporting and audits of financial statements, as well as the quality and integrity of the Company's financial statements and reports and the qualifications, independence and performance of the registered public accounting firm or firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors"), and the performance of the Company's internal audit function as well as oversight of the Company's healthcare and privacy programs. The operation of the Committee shall be subject to the Amended and Restated Bylaws of the Company as in effect from time to time and Section 141 of the Delaware General Corporation Law.

\*\*\*

The Committee shall oversee the Company's financial reporting process on behalf of the Board, shall have direct responsibility for the appointment, compensation, retention and oversight of the work of the Auditors and any other registered public accounting firm engaged for the purpose of performing other review or attest services for the Company. The Auditors and each such other registered public accounting firm shall report directly and be accountable to the Committee. The Committee's functions and procedures should remain flexible to address changing circumstances most effectively. To implement the Committee's purpose and policy, the Committee shall be charged with the following functions and processes with the understanding, however, that the Committee may supplement or (except as otherwise required by applicable laws or rules) deviate from these activities as appropriate under the circumstances:

\*\*\*

Audited Financial Statement Review. To review, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the Securities and Exchange Commission (the "SEC") and to recommend whether or not such financial statements should be so included.

\*\*\*

**Quarterly Results**. To review with management and the Auditors, as appropriate, the results of the Auditors' review of the Company's quarterly financial statements, prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditors under standards of the PCAOB.

**Management's Discussion and Analysis**. To review with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the SEC.

**Press Releases**. To review with management and the Auditors, as appropriate, earnings press releases, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies, which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The chairperson of the Committee may represent the entire Committee for purposes of this discussion.

## SUBSTANTIVE ALLEGATIONS

28.     The Company is a specialty pharmaceutical company that focuses on the development and commercialization of therapies for the treatment of acute pain. The Company's lead product candidate is DSUVIA, a 30 mcg sufentanil sublingual tablet for the treatment of moderate-to severe acute pain.  DSUVIA is a potent opioid painkiller that is of particular use in certain special circumstances where adult patients may not be able to swallow oral medication and where access to intravenous pain relief is not possible.  The Company has marketed DSUVIA in advertisements as a one-step, simple to administer drug, accompanied by the slogan "TONGUE AND DONE" for the product, which refers to DSUVIA's sublingual administration—*i.e.*, a tablet of DSUVIA is placed beneath the tongue to dissolve. Marketing materials also touted that patients may retake the drug in one-hour intervals, without providing a maximum daily dosage.

29.     On November 2, 2018, the Company announced that the FDA had approved DSUVIA for the management of acute pain in adults that is severe enough to require an opioid analgesic in certified medically supervised healthcare settings, such as hospitals, surgical centers, and emergency departments.

### Materially False and Misleading Statements

30.     On March 16, 2020, the Company filed an annual report on Form 10-K with the SEC (the "2019 Form 10-K").  The 2019 Form 10-K touted the Company's sales and marketing practices for DSUVIA, representing, *inter alia*, that the Company has (i) "created and deployed a focused scientific support team to gather a

detailed understanding of individual emergency room and hospital needs in order to present DSUVIA effectively"; (ii) "increased awareness of the clinical profile of sublingual administration of sufentanil through publication of our clinical data"; (iii) "engaged appropriate Advisory Boards that include representative emergency room physicians, anesthesiologists, surgeons, nurses, pharmacy and therapeutics, or P&T, committee members and other related experts to provide us with input on appropriate commercial positioning for DSUVIA for each of these key audiences"; (iv) "built a sales and marketing organization that can define appropriate segmentation and positioning strategies and tactics for DSUVIA"; and (v) "established DSUVIA on hospital and ambulatory surgery center formularies through deployment of an experienced team to explain the clinical and health economic attributes of DSUVIA."

31.     The 2019 Form 10-K also reported that the Company "may adjust [its] commercialization plan" by, among other things, "continuing to build and progressively deploy a high-quality, customer-focused and experienced sales organization in the United States dedicated to bringing innovative, highly valued healthcare solutions to patients, payers and healthcare providers," as needed, and by "continuing to establish DSUVIA as a suitable choice for moderate to-severe acute pain in certified medically supervised settings."

32.     Further, the 2019 Form 10-K touted that the Company "ha[s] carried out an evaluation, under the supervision, and with the participation, of management including our principal executive officer and principal financial officer, of our disclosure controls and procedures . . . as of the end of the period covered by" the 2019 Form 10-K, and that, "[b]ased on their evaluation, our principal executive officer and principal financial officer concluded that . . . our disclosure controls and procedures were effective as of December 31, 2019."

33.     Appended as exhibits to the 2019 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Agnotti

and Asadorian certified that "[t]he [2019 Form 10-K] fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act" and that "[t]he information contained in the [2019 Form 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company." Further, Defendants Adams, Palmer, Edwards, Hoffman, Afable, Rosen and Wan signed the 2019 Form 10-K.

34.     On May 11, 2020, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2020 (the "1Q20 Form 10-Q"). The 1Q20 Form 10-Q contained substantively the same statements as referenced in ¶ 32, touting the effectiveness of the Company's disclosure controls and procedures for the period covered by the report.

35.     Appended as exhibits to the 1Q20 Form 10-Q were substantively the same SOX certifications as referenced in ¶ 33, signed by Defendants Agnotti and Asadorian.

36.     On August 10, 2020, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2020 (the "2Q20 Form 10-Q"). The 2Q20 Form 10-Q contained substantively the same statements as referenced in ¶ 32, touting the effectiveness of the Company's disclosure controls and procedures for the period covered by the report.

37.     Appended as exhibits to the 2Q20 Form 10-Q were substantively the same SOX certifications as referenced in ¶ 33, signed by Defendants Agnotti and Asadorian.

38.     On November 5, 2020, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2020 (the "3Q20 Form 10-Q"). The 3Q20 Form 10-Q

contained substantively the same statements as referenced in ¶ 32, touting the effectiveness of the Company's disclosure controls and procedures for the period covered by the report.

39.     Appended as exhibits to the 3Q20 Form 10-Q were substantively the same SOX certifications as referenced in ¶ 33, signed by Defendants Agnotti and Asadorian.

40.     The statements referenced in ¶¶ 30-39 were materially false and misleading because Defendants caused the Company to make false and/or misleading statements and/or failed to disclose that: (i) the Company had deficient disclosure controls and procedures with respect to its marketing of DSUVIA; (ii) as a result, the Company had been making false or misleading claims and representations about the risks and efficacy of DSUVIA in certain advertisements and displays; (iii) the foregoing conduct subjected the Company to increased regulatory scrutiny and enforcement; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

## THE TRUTH EMERGES

41.     On February 16, 2021, the Company filed a current report on Form 8-K with the SEC, disclosing that, on February 11, 2021, the Company received a warning letter from the FDA concerning promotional claims for DSUVIA.  The Form 8-K stated:

> On February 11, 2021, AcelRx . . . received a warning letter from the Office of Prescription Drug Promotion ("OPDP") of the [FDA] (the "Letter") relating to a banner advertisement the Company submitted to the OPDP on December 6, 2019 (the "Banner Ad"), and a tabletop display the Company submitted on February 28, 2020, and resubmitted to the OPDP at its request on September 23, 2020 (the "Tabletop Display," and together with the Banner Ad, the "Promotional Material").

> The Company submitted the materials to the OPDP pursuant to the FDA requirement that sponsors submit all promotional materials to the FDA at

the time of their initial dissemination or publication.  The FDA's concerns identified in the Letter include its view that the Promotional Material makes misleading claims and representations about the risks and efficacy of DSUVIA® because the Promotional Material does not reveal facts that are material in light of the representations made . . . . [T]he Company has not used the Banner Ad since late 2019, nor used the table drape that is part of the Tabletop Display since November 2019; however, the Company plans to review its marketing materials to identify any potential revisions in light of the Letter. The Company intends to respond to the FDA within the timeframe requested in the Letter and seek guidance and clarification from the FDA on the concerns raised in the Letter. The Letter does not restrict the Company's ability to manufacture or sell DSUVIA. The Company cannot give any assurances, however, that the FDA will be satisfied with its response to the Letter or that such response will resolve the issues identified in the Letter.

42.    The FDA warning letter advised that the agency "has reviewed an 'SDS Banner Ad' (banner) (PM-US-DSV-0018) and a tabletop display (PM-US-DSV-0049) (display) for DSUVIA (sufentanil) sublingual tablet, CII (Dsuvia) submitted by AcelRx," and that "[t]he promotional communications, the banner and display, make false or misleading claims and representations about the risks and efficacy of DSUVIA," which "misbrand Dsuvia within the meaning of the Federal Food, Drug and Cosmetic Act (FD&C Act) and make its distribution violative."

43.    The FDA warning letter noted the following deficiency with respect to the banner and tabletop display at issue: "The banner includes the claim, 'DSUVIA® comes in one strength for acute pain. . . **TONGUE AND DONE**.' (bolded emphasis original; reference omitted) in conjunction with an image of the single-dose applicator device.  Similarly, the display prominently includes the claim '**TONGUE AND DONE**' (bolded emphasis original)." The FDA found that "[t]hese presentations are misleading because they imply that the administration of Dsuvia consists of a simple, one-step process, when this is not the case," and that, "[i]n fact, there are numerous administration steps outlined in the PI [the FDA-approved

1  product labeling], including a separate, distinct step to visually confirm tablet

2  placement in the patient's sublingual space of the mouth."

3         44.   The FDA warning letter further advised that the banner at issue was

4  deficient for stating: "Minimum redosing interval **1 hour**" and "Average redosing

5  interval **3 hours***… *Shown over a 12-hour period in the pivotal trial" (emphases

6  and alteration in original), because they "create a misleading impression about the

7  use of Dsuvia" by "omit[ting] . . . material information from the DOSING AND

8  ADMINISTRATION section of the PI."   Specifically, the banner should have

9  included the words "Do not exceed 12 tablets in 24 hours" because, "[b]y omitting

10  this material information about the maximum daily dosage, the banner creates a

11  misleading impression about the safe use of Dsuvia."  The FDA noted that "[t]hese

12  omissions are concerning from a public health perspective due to the serious risks

13  associated with overdose with Dsuvia, including respiratory depression and death,

14  that should be considered when prescribing the product."

15         45.   In addition, the FDA warning letter took issue with the banner's claim

16  that "DSUVIA® comes in one strength for acute pain" because "the banner makes

17  representations about the indication and use of the drug but fails to adequately convey

18  material information regarding Dsuvia's limitations of use, thereby creating a

19  misleading impression about the drug."

20         46.   The FDA warning letter also found that "unlike the benefit claims in the

21  banner, which utilized a color background and large font, the full indication with the

22  limitations of use are intermingled with risk information in a paragraph format in a

23  much smaller font size and a plain white background," which were only accessible

24  to viewers by scrolling down the banner and, therefore, did "not mitigate the

25  misleading impression."

26         47.   The FDA warning letter also noted that the banner and tabletop display

27  at issue "fail to present information relating to the Boxed Warning,

28

Contraindications, Warnings and Precautions, and Adverse Reactions for Dsuvia with a prominence and readability reasonably comparable with the presentation of information relating to the benefits of Dsuvia." The FDA warning letter found that "benefit claims for Dsuvia are presented in conjunction with colorful graphics and large bolded headlines, with significant white space," whereas "the risk information is relegated farther down in paragraph format with less prominence." The FDA therefore concluded that "[b]y failing to adequately present the risks and benefits associated with Dsuvia, the banner and display create a misleading impression about the safe and effective use of the drug."

48.    The FDA warning letter also "request[ed] that AcelRx cease any violations of the FD&C Act" and "submit a written response to th[e] letter within 15 days from the date of receipt."

49.    On this news, the Company's stock price fell $0.21 per share, or 8.37%, to close at $2.30 per share on February 16, 2021.

## DUTIES OF DEFENDANTS

50.    By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

51.    Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition,

as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

52.     Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

53.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

      a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

      b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

      c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making

accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

      d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

      e)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

54.    Each Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware or should have been aware posed a risk of serious injury to the Company.

55.    Each director and officer of the Company owed to the Company the fiduciary duty to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing.

56.    Defendants breached their duties of loyalty and good faith by causing the Company to misrepresent the information as detailed *infra.*  Defendants subjected the Company to the costs of defending and the potential liability from a class action

lawsuit for violations of the federal securities laws.  As a result, the Company has expended, and will continue to expend, significant sums of money.

57.     Defendants' actions have irreparably damaged the Company's corporate image and goodwill.

## DEMAND FUTILITY ALLEGATIONS

58.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

59.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered by the Company because of the breaches of fiduciary duty by Defendants.

60.     Because of the facts set forth herein, Plaintiff has not made a demand on the Board of the Company to institute this action against Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

61.     The Board is currently comprised of Adams, Afable, Edwards, Angotti, Hoffman, Palmer, Bozilenko, Rosen and Wan.  Thus, Plaintiff is required to show that a majority of Defendants, *i.e.*, *five* (5), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

62.     Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning the information described herein.  Because of their advisory, executive, managerial, and directorial positions with the Company, Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

63.     Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation, proximately causing millions of dollars of losses for Company shareholders.

64.     Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made (and is excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

65.     Any suit by the Board to remedy these wrongs would likely expose the Company to further violations of the securities laws that would result in civil actions being filed; thus, the Board members are hopelessly conflicted in making any supposedly independent determination about whether to sue themselves.

66.     Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

67.     Defendants authorized and/or permitted the Company to make false statements that disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

## **DEFENDANTS ARE NOT INDEPENDENT**

**Defendant Angotti**

68.    Defendant Angotti is the CEO of the Company.  Defendant Angotti is also a Director of the Company.

69.    Defendant Angotti is not disinterested or independent, and therefore, is incapable of considering demand because Angotti (as CEO) is an employee of the Company who derived substantially all of his income from his employment with the Company, making him not independent.  As such, Angotti cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

70.    This lack of independence and financial benefits received by Defendant Angotti renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

71.    Defendant Angotti is also a defendant in the securities class action entitled *Sneed v. AcelRx Pharmaceuticals, Inc., et al.*, Case 3:21-cv-04353 (N.D. Cal.).

**Defendant Palmer**

72.    Defendant Palmer has served as a Company director and Chief Medical Officer since she co-founded the Company in July 2005.

73.    Defendant Palmer is not disinterested or independent, and therefore, is incapable of considering demand because Palmer (as Chief Medical Officer and Founder) is an employee of the Company who derived substantially all of her income from her employment with the Company, making her not independent.  As such, Palmer cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability and threaten her livelihood.

74.     This lack of independence and financial benefits received by Defendant Palmer renders her incapable of impartially considering a demand to commence and vigorously prosecute this action.

**Defendant Rosen**

75.     Defendant Rosen served as the Company's CEO from April 1, 2016 until March 5, 2017, as the Company's interim CEO from April 1, 2015 until March 31, 2016, and has served as a Company director since 2008.

76.     Defendant Rosen is not disinterested or independent, and therefore, is incapable of considering demand because Rosen (as a former CEO) was an employee of the Company who derived substantially all of his income from his employment with the Company, making him not independent.   As such, Rosen cannot independently consider any demand to sue himself for breaching her fiduciary duties to the Company, because that would expose him to liability and threaten him livelihood.

77.     This lack of independence and financial benefits received by Defendant Rosen renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

**Defendant Adams, Edwards, Rosen and Hoffman**

78.     Defendants Adams, Edwards, Rosen and Hoffman served as members of the Audit Committee during the Relevant Period.   Pursuant to the Audit Committee Charter, the Audit Committee Defendants were responsible for, *inter alia*, the effectiveness of the Company's internal controls, the integrity of its financial statements, and aspects of risk management and legal and regulatory compliance that may affect the Company's financial reporting.   Defendants Adams, Edwards, Rosen and Hoffman failed to ensure the integrity of the Company's internal controls, as they are charged to do under the Audit Committee Charter and to issue false and misleading financial statements with the SEC.   Thus, Defendants Adams, Edwards,

Rosen and Hoffman breached their fiduciary duties, are not disinterested, and demand is excused as to them.

## FIRST CAUSE OF ACTION

### (Against Defendants For Breach of Fiduciary Duty)

79.    Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

80.    Defendants owed and owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty and due care.

81.    Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

82.    Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

83.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant and actual damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

84.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### (Against Defendants for Unjust Enrichment)

85.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

86.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of the Company in the form of salaries, bonuses, and other forms of compensation.

87.     Plaintiff, as a shareholder and representatives of the Company, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### THIRD CAUSE OF ACTION

### (Against Defendants for Abuse of Control)

88.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

89.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

90.     As a direct and proximate result of Defendants' abuse of control, the Company has sustained significant damages.  As a direct and proximate result of Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, the Company has sustained and continues to sustain significant damages.

91.     As a result of the misconduct alleged herein, Defendants are liable to the Company.  Plaintiff, on behalf of the Company, has no adequate remedy at law.

### FOURTH CAUSE OF ACTION

### (Against Defendants for Waste of Corporate Assets)

92.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

93.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused the Company to waste valuable corporate assets by failing to disclose (i) the Company had a material weakness in its internal control over financial reporting; (ii) the Company's disclosure controls and procedures were not effective; and (iii) as a

result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

94.     Further, during the Relevant Period, the Director Defendants disseminated or approved public statements that failed to disclose or deliberately disregarded: (i) the Company had deficient disclosure controls and procedures with respect to its marketing of DSUVIA; (ii) as a result, the Company had been making false or misleading claims and representations about the risks and efficacy of DSUVIA in certain advertisements and displays; (iii) the foregoing conduct subjected the Company to increased regulatory scrutiny and enforcement; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.

95.     As a result of the waste of corporate assets, Defendants are each liable to the Company.

96.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

**FIFTH CAUSE OF ACTION**
**(Against Defendants Angotti and Asadorian for Violations**
**of Sections 10(b) and 21D Of The Exchange Act)**

97.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

98.     The Company, along with Defendants Angotti and Asadorian are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of law, the Company's liability will be in whole or in part due to Defendants Angotti and Asadorian's willful and/or reckless violations of their obligations as officers and directors of the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

99.    Through their positions of control and authority as officers of the Company, Defendants Angotti and Asadorian were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts described in the Securities Class Action and herein.

100.    As such, Defendants Angotti and Asadorian are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff pray for relief and judgment as follows:

A.    Against Defendants in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, waste of corporate assets and violations of Sections 10(b) and 21D of the Exchange Act;

B.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

C.    Granting such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: July 1, 2021

**MAGNANIMO & DEAN, LLP**

By: _____
      FRANK A. MAGNANIMO
      21031 Ventura Boulevard

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Suite 803
Woodland Hills, CA 91364
Telephone: (818) 305-3450
Facsimile: (818) 305-3451
Email: Frank@MagDeanLaw.com

Thomas J. McKenna
Gregory M. Egleston
**GAINEY McKENNA & EGLESTON**
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*

1

## VERIFICATION

2     I, JOSELITO GONZALEZ, declare that I have reviewed the Verified
3 Shareholder Derivative Complaint ("Complaint") prepared on behalf of AcelRx
4 Pharmaceuticals, Inc. and authorize its filing. I have reviewed the allegations made
5 in the Complaint, and to those allegations of which I have personal knowledge, I
6 believe those allegations to be true. As to those allegations of which I do not have
7 personal knowledge, I rely on my counsel and their investigation and for that reason
8 believe them to be true. I further declare that I am a current holder, and have been a
9 holder, of AcelRx Pharmaceuticals, Inc. common stock at all relevant times.

10

11    _____

12    JOSELITO GONZALEZ
      JOSELITO GONZALES

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1